UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Mag. No. 10-MJ-71 (FLN)

| | |
|---|---|
| In Re Search Warrants of February 23, 2010, and Later Days | **SWORN DECLARATION OF MARK J. KALLENBACH, ESQ.** |

Mark J. Kallenbach, Esq. makes the following sworn declaration pursuant to 28 U.S.C. § 1746.

1. Since approximately 1981, I have been licensed as a certified public accountant by the Minnesota Board of Accountancy.

2. As a certified public accountant, I have prepared hundreds of financial statements, including audited statements, reviews and compilation reports. I have also prepared hundreds of tax returns.

3. In 1983, I was admitted to practice law in Minnesota. I am admitted to practice before the federal court for the District of Minnesota, to the Eighth Circuit Court of Appeals, and to the United States Tax court.

4. My present law practice consists of consulting with companies which are in the early stage of development and are experiencing growing pains. I also handle business litigation, professional malpractice claims, and claims against insurance companies and banks. I also prosecute appeals when appropriate.

5. In the late 1980s or early 1990s, I placed my license to practice public accountancy on an "inactive status." Since then I have been practicing law and engaging in other business endeavors.

6.      In my law practice, I continue to use the skills that I acquired as a certified public accountant. I analyze at least ten financial statements or similar documents in a given month.

7.      On January 13, 2010, Inter-Mark Corporation ("IMC") employed me on a monthly basis to assist it with legal matters. Since then, I have acted in that capacity.

8.      My investigation shows that Inter-Mark and its subsidiary iNetGlobal and its other subsidiaries are clean, legitimate and profitable businesses.

9.      One of the matters that I was asked to address was IMC's January 5, 2010 termination of Mr. Steven Keough, its President, Chief Executive Officer, and lawyer. Mr. Keough was terminated because within a month or so after being hired in late October of 2009, Mr. Keough made no progress in understanding the business, did not fit in with IMC's rank and file, was unwilling to work with IMC's board of directors, and attempted to take over IMC's business from Mr. Steven Renner.

10.     As part of my "due diligence" in wrapping up IMC's termination of Mr. Keough's employment, I investigated and explored the reasons for Mr. Keough's termination.

11.     Among other things, I have viewed a marketing tape made by Mr. Keough on December 29, 2009. This video was posted on iNetGlobal's website on January 5, 2010 for review by customers and the public. iNetGlobal is a subsidiary of Inter-Mark. When the Secret Service viewed the website, it would have seen this video. In it Mr. Keough stated that his focus in 2010 was going to be to recruit many more customers all around the world. He did not say anything about the business being illegal.

66651.1                                                2

12. On January 6, 2010, Mr. Keough attempted to extort over $500,000 from iNetGlobal. He demanded payment of the money by 5:00 p.m. that day "or all bets are off." A copy of the e-mail is attached as Exhibit A.

13. According to the Secret Service's affidavit, Keough contacted the government in this matter for the first time on January 8, 2010.

14. As of that date, January 8, 2010, Mr. Keough had not informed any officer, board member, or employee of Inter-Mark or iNetGlobal that he thought there was any illegal activity.

15. On or about January 17, 2010, IMC learned that the United States Secret Service was conducting an investigation of it.

16. On January 17, 2010 or thereabouts until January 25, 2010, I left three or four voicemails with Ms. Katherine Westpetal of the United States Secret Service. I asked whether the Secret Service was investigating IMC and informed her that IMC would cooperate with any investigation.

17. On the morning of January 26, 2010, I met with Mr. Keough for breakfast to discuss his dispute with IMC. The meeting lasted 45 minutes. Mr. Keough presented a three-ring binder to me containing a draft of a 13 page complaint against IMC and others. At no time did Mr. Keough indicate to me that IMC was involved in any illegal business. His complaint was that he had been illegally terminated because he questioned disbursements that were made to Mr. Renner so that Mr. Renner could pay taxes due and owing to the government.

18.     On the afternoon of January 26, 2010, Special Agent Westpetal left a voice message in response to my January 25, 2010 voicemail with her office. She stated in her voicemail message to me that she appreciated my offer of cooperation and stated that she did not think she needed any input at all. She stated "its we just have some initial concerns from awhile ago and we've been looking into it so again, not that big of a deal, nothing that we need cooperation on by any means but if we do deem that appropriate down the line I will definitely give you a call." I never heard anything again from the Secret Service until it executed search warrants on February 23, 2010.

19.     I believe there are statements in Ms. Westpetal's affidavits in support of the search and seizure warrants in this case which are either knowingly false or in reckless disregard of the truth. The entire premise of Ms. Westpetal's first affidavit, Docket No. 3, is that iNetGlobal does not sell any legitimate advertising services. It is a business, she contends, that does not really do business and that depends upon "member growth" to pay rebates. ¶46. At paragraph 54, Ms. Westpetal states that Special Agent William Stack had logged into iNetGlobal and begun to visit its paid advertisements. She stated that ads "range from other multi-level marketing sites to affiliate programs, non-English websites, and even iNetGlobal's home page. Her affidavit then states "Few Legitimate Advertisers."

20.     I have visited the website several times myself over the past days since the search warrant was executed.

21. It is not true that the website advertisements include only other multi-level marketing sites, affiliate programs, non-English websites, and iNetGlobal's home page. Anyone who viewed the website would know this.

22. The website indicates the precise number of advertisements that are posted on iNetGlobal's website by its customers daily. For example on March 23, 2010, there were 19,061 ads posted. Historically there have been between 10,000 and 20,000 ads per day posted. Most of the ads run for a short period of time. A viewer has the option of searching the ads by key word. I have done a random survey of the ads posted in the days since February 23 and have found ads for small businesses selling numerous goods and services, including bowling lessons, golf lessons, nutritional supplements, purified water, camera equipment, photograph lessons, investments in foreign currency exchanges, optical products, wedding services, fishing secrets, soccer conditioning, gardening manuals for organic vegetables, travel agency services, manuals on building high performance computers, dental hygiene clinics, food recipes, making wine and beer at home, golf, Chinese medicine, acupuncture and herbs, home woodworking, coffee, real estate sales, auto insurance, online grocery shopping, and thousands of other businesses, each of which is selling products unique to that business. I estimate 90% of the ads are in English. It is simply false to say there are "Few Legitimate Advertisers" or to say the ads only include multi-level marketing sites, affiliate sites, non-English websites, and iNetGlobal's home page. It is false to say there was no legitimate business, and false to say iNetGlobal depended only on "member growth" for revenue.

23.     SA Westpetal states at paragraph 56 that customers were paid to view ads even when it was impossible to view them. The reason customers were given credit on these three days was due to technical problems with the platform on those days. This was an isolated incident. Most of these customers had paid for the right to view ads, and to receive discounts for viewing. There was no regular practice of paying customers to view ads when there were none to be viewed.

24.     Other false statements in the Westpetal affidavit involve paragraphs 63-69.

25.     These paragraphs describe an iNetGlobal seminar at which Mr. Renner spoke in New York on January 23, 2010. In fact, it was a two day seminar extending into January 24, 2010. I have watched a tape of parts of that seminar. These paragraphs are false by omission. On January 24, Mr. Renner clearly told those present that iNetGlobal was a sales company, that iNetGlobal did not guarantee that the customers would make any money, that no commissions were paid unless a sale is made, and that commissions could be earned only through the customers' own efforts. The Westpetal affidavit does not tell the court of these disclaimers.

26.     Paragraph 67 of the Westpetal affidavit specifically describes a subsidiary of iNetGlobal called V-Local. SA Westpetal implies that V-Local has very few listings and its search engine does not work.

27.     SA Westpetal describes in paragraph 67 searching for "coffee shop" in Minneapolis, Minnesota on V-Local, and finding no results. Westpetal also alleges that when she searched under "coffee shop, food and dining," six coffee shops in Iowa,

Kansas and other states were identified, only one of which was in Minnesota. She also describes searching on V-Local for "gym" and "restaurant".

28. To test Ms. Westpetal's affidavit, on March 3, 2010, I did a search on V-Local for "restaurant." As Ms. Westpetal stated, the search yielded no results. However, the user is urged by the program to use a less generic, more specific key word. Accordingly, I searched in Minneapolis, Minnesota for "Chinese restaurant" and located six restaurants in V-Local. I searched for "Mexican restaurant" in Minneapolis and was given twelve listings. I searched for "barbeque restaurants," and was given six listings. I also found two Mediterranean restaurants.

29. I then searched for "coffee shops" in Minneapolis, Minnesota and came up with six listings in the Minneapolis area. Ms. Westpetal's affidavit is false in stating that V-Local is populated only with one coffee shop in all of Minnesota, and no gymnasiums or restaurants. Anyone viewing the website would see this then and now.

30. The true facts are that V-Local has 3,511,000 businesses listed on its search engine. iNetGlobal purchased the right to populate V-Local with these listings from a company called Info USA. In addition, V-Local has sold 37,832 additional listings by new customers on V-Local.

31. I believe that if the Court knew of the above false statements made by SA Westpetal, it would not have signed the search and seizure affidavits in this case.

32. The effect of the seizure of the business assets and records is to put almost 75 people out of work. These are workers of modest means. Eight of them are computer programmers. Some of the programmers work in research and development. Some

employees are in customer service. Some have language expertise in Mandarin, Russian, and Spanish. Some are salespeople. Some are accountants and bookkeepers. The money seized was in part for their paychecks. It was in part for payment of their children's health insurance premiums.

33. The money seized, $25 million in all, consists of approximately $11 million which is owed to customers of iNetGlobal.

34. iNetGlobal is not an investment business. It makes no promise of return on investments. It sells internet services to individuals and to small businesses. Most of its revenues come from the sale of those services.

35. iNetGlobal sells a product called V-Web which is a web hosting service. It provides customers a place where they can set up their own websites. It also provides customers a place where they can register their proprietary domain names. Approximately 50,000 customers have purchased the right to set up websites. So far, 2,378 websites have been set up. As the business is less than 18 months old, most websites have been set up within the last six months. The sales trend here is up. 24 websites were set up in April of 2009, 91 in September of 2009, 338 in December of 2009, 361 in January of 2010, and 327 in February of 2010, even though the month was shortened by the execution of the search warrant affidavit.

36. 50,000 customers have purchased the right to register their domain names. So far 3,031 have registered their domain names with V-Web. The sales trend here is also up over time.

37. The Court may ask why so few websites and domain names have been registered. The Court should understand that most of the customers are older people in their 40s, 50s and 60s who have no experience with the use of the internet to set up a website, register a domain name, do advertising, or run a business. Many of our customers are neophytes. They are gradually learning these skills.

38. iNetGlobal also sells a product called V-Mail and e-mail marketing service. It provides a way for customers to create an e-mailing marketing list and to communicate with their own customers.

39. Another product is called V-Shops which provides a way for businesses to sell online to their customers.

40. Another service sold is called V-Train. This is an online training service which teaches customers how to register domain names, to set up their own websites, to establish their own e-mail marketing service, and to market their business on the internet. It allows a customer to view hundreds of hours of films, still shots and text that teaches them these skills.

41. iNetGlobal also sells online trafficking and advertising services. There are two principal services. One is the Acesse search engine, which is similar to Yahoo, Google and Bing. The company has a development agreement with Yahoo. Yahoo allows Acesse to use its search results in the Acesse search engine for free. At some point when Acesse builds enough volume, Yahoo will begin to charge for this service.

42. The second service is a "pay per view" platform where customers place their own advertisements for their own businesses. In doing so, customers generate more

traffic to their websites which are hosted by iNetGlobal, and to any websites they may have which are not hosted by iNetGlobal. They are also able to sell goods and services directly to their own customers.

43. iNetGlobal also sells a service called V-Local, described above at ¶30.

44. Another service sold is V-Webcast which sells online conferencing services to allow people to conduct online video and audio conferences over the internet.

45. Another service sold is V-Newswire. It sells press release services. For a fee, the company will write and distribute press releases over the internet. iNetGlobal purchased the right to distribute press releases to over 800,000 media outlets around the world.

46. Most of the company's revenues come from customer purchases of the web hosting, domain registration, web training, e-mail services and advertising. The sale of advertising generates the most revenue. The most important thing a business needs are these services, which allow it to register a domain name, get the websites up and running (many have more than one), place their weblogs, promotions, and advertisements.

47. Most of the customers – about two-thirds – and it is this point that the Secret Service did not grasp – are constantly putting new money into the business in the form of monthly subscription fees and advertising purchases. Most of the customers buy services on an ongoing monthly basis. Most of the customers are not just surfing ads, as the Secret Service suggests. New money from new customers is not being used to pay off old customers.

48. It is possible for customers to earn commissions. To do so they register as sales consultants for $59.95 and they sell the company's services to other people. They can get a commission for doing so. They can also get a commission by recruiting someone else to sell on their sales team. For example, one could sell advertising to another person to be placed on the pay per view platform.

49. No one gets commissions simply by recruiting a consultant. The new consultant has to make a retail sale of one of the company's services. Then both the consultant and the new recruit share in the commission.

50. It is critical to know that all commissions are calculated by the computer software on a daily basis. And the accounting is done daily. When the company incurs a liability to a consultant for commissions, the commission is immediately booked on an accrual basis and the money is set aside in a separate escrow account to pay the commissions. A given sales consultant's commissions are tracked, escrowed, and paid out to the customer within two weeks upon request. This business has never paid out more money than it took in. It has never promised to pay out more money than it took in. It has never paid old customers their commissions with monies from new customers.

51. You will see in the seizure returns that the Secret Service seized $25 million or so. Of that $25 million, $11 million is money that was escrowed for customers. Of the $25 million, many thousands represent employee pay and health insurance premiums. The company had monies escrowed to cover all commissions owed, and to cover taxes as well. The tax money was also seized by the Secret Service.

52. The books and records of the company support what I say. In a Ponzi scheme, the liabilities of the company increase drastically over time. Its cash on hand, however stays flat or even declines. The books and records of the company over the past 14 months show that as the liabilities of the company have increased, the revenues and the cash on hand have increased even more. For the last 3 months the liabilities have been only about 11 percent of the cash on hand. All of these figures are in financial statements prepared independent of Mr. Renner.

53. There is an iNet surf program. It relates to the advertising. It is too complicated to fully explain in this space. In essence, one can sign up to participate as a "free surfer." This is free. It does not cost anything. If one free surfs, meaning clicks on the customers advertisements posted on the company's pay per view platform, the customer can get gift coupons to redeem through Amazon.com. There are 10,000 to 20,000 customer ads posted at any one time. The ads are changing daily. Some of them are up only for a few days. If a customer clicks on 25,000 ads for 30 seconds at a time, the customer can get a $25 gift certificate. That is all. The free surfers do not get anything else. The company purchased the gift cards from Amazon. The cash reserves to cover this obligation going forward are also escrowed.

54. There is another form of surfing. The customers who pay in monthly can earn back a percentage of the services they purchase. They do this by viewing the ads on the iNetGlobal website. If a customer purchases $100 in webhosting service, for example, the customer can get up to $50 back from the company by viewing ads posted by advertisers.

55. Here is the value of the advertising with iNetGlobal:

   a. There are so many surfers on the pay per view ad platform that an advertiser is assured of immediate eyeballs seeing the ads, there being 1.5 million page views per day. Within minutes of any ad being posted, it is being viewed. It is as efficient as a television ad.

   b. The market's brand awareness of the product or service the advertiser is selling is increased.

   c. Advertisers drive customers to their own websites, enabling them to sell their perfumes, or auto parts, or paper products, or whatever.

   d. Viewers from 120 countries view the ads.

   e. The customer optimizes his website's profile on the major search engines. The more ad views he accumulates, the more credibility he or she has with Google, Yahoo, Bing and Acesse. His rankings by these engines based on customer hits will increase and result in even more traffic. Some of iNetGlobal's customers are ranked first by Google in their business specialties in their communities.

   f. Viewers do not have to randomly surf. They can search for goods and services by keyword.

   g. iNetGlobal gives the advertiser detailed statistics showing the impression (how many times the ad is shown on iNetGlobal's rotator) and clicks (how many times the ad is viewed), which allows the advertiser to target a specific market.

56. As of the date of the warrants, the vast majority of the customers were paying monthly for services. 50,000 customers pay for monthly web hosting services, 50,000 for domain registration, and 50,000 for online training. 40,000 pay for monthly e-mail marketing services. 40,000 pay each month for advertising.

57. All payments back to customers are strictly limited. The company does not incur obligations it cannot pay.

58. Mr. Renner was putting most of the revenues back into the business. He was about to purchase a building for expansion space. He was pouring hundreds of thousands of dollars into software development. He was hiring more employees.

59. SA Westpetal contends in paragraph 59 of her affidavit that this is a Ponzi scheme because of the absence of any reasonable or legitimate business investment.

60. It is obvious that the Secret Service did not have in its possession IMC's financial statements. In order to ensure the accuracy of IMC's financial and tax reporting, it retained the CPA firm of Lethert, Skwira, Schultz & Co., LLP, which prepared the statements. I have reviewed them.

61. The books show that for the 12 month fiscal year ending October 31, 2009, IMC's sales amounted to approximately $47.4 million with an after tax net income of $1.7 million. For the month of November 2009 IMC's sales were $16.7 million with an after tax net income of $0.56 million. For the month of December 2009, IMC's sales were $22.8 million with an after tax net income of $0.7 million. For the month of January 2010, IMC's sales were $29.5 million with an after tax net income of $1.2 million.

62. The books show that for the fiscal year ending on October 31, 2009, IMC had cash on hand of $8.3 million. Its total liabilities amounted to $7.5 million leaving a cash surplus of $0.8 million. For the month of November 2009, IMC's total cash amounted to $10.7 million and its total liabilities amounted to $9.8 million, leaving a cash surplus of $0.9 million. For the month of December 2009, IMC's total cash amounted to $14.5 million, its total liabilities amounted to $12.9 million, leaving a cash surplus of $1.7 million. For the month of January 2010, IMC's cash amounted to $15.7 million, its total liabilities amounted to $12.7 million, leaving a cash surplus of $3 million.

63. The accounting firm based its numbers upon numbers provided to it by IMC's finance and accounting department. I know from my study of the business that Mr. Renner does not have anything to do with the generation of the figures that the accounting department in turn uses. The accounting department uses figures generated by the computer system run by other persons.

64. Based on my 30 years of experience in the business and legal communities, I believe that if IMC was closed today, and all of its obligations paid, IMC would still have as of January 31, 2010 $4.5 million in cash.

65. My investigation has also revealed that the informant Steven Keough told numerous lies to the United States Secret Service.

66. The entire premise of Keough's falsehoods to the Secret Service, and of the Secret Service's affidavit, is that money from new customers is being used to pay obligations to old customers. I have analyzed the business. This is not the case. Over

the course of the life of the business there has been a constant flow of new money injected into the business by old customers who are continuing to purchase IMC's products and services on a monthly basis. On March 2, 2010, I asked IMC to produce a listing of its ongoing customers for me. This report showed that IMC has 9,566 customers who pay $20 per month for web hosting, e-mail marketing services, and training. In addition, there are 39,169 customers who pay $40 per month to IMC for web hosting, e-mail marketing services and training, and V-Mail. Thus, IMC receives approximately $1,758,080 in recurring sales from old customers each month. This is the opposite of what one would expect in a Ponzi scheme, where no new money comes in from old customers. IMC has collected millions of dollars in monthly subscription fees since October of 2009. This is why it had the cash on hand to meet all of its obligations, until the Secret Service took the cash.

67. At paragraphs 60-62 of the Westpetal affidavit, the Secret Service is very critical of iNetGlobal's customer service. This impression is based upon falsehoods conveyed by Keough. When Keough first began working at the company, the company had just installed new servers. Thus, the system was down a tiny bit more frequently than before the installation of the new servers. I have been provided with documents which have recorded the amount of time that the servers and computer programs have been up and operating at iNetGlobal during the time that Keough was employed there, from October 27, 2009 through January 5, 2010. The servers were up 99.97% of the time when Keough was employed there. They were offline approximately 3 minutes total in 8 weeks. During the same period of time, the programs on the servers were working

99.395% of the time. There were approximately 500 minutes over that 8 weeks where customers could not use the actual site. This amounted to approximately 1 hour per week.

68.     Paragraph 44 of the Westpetal affidavit contends that there was only one iNetGlobal employee available to assist customers in placing their advertisements on the rotator. This misconceives the business. In truth, the customers place their own advertisements on the rotator based upon the online training that is available to them. In truth, when Keough was employed at the company there were 10 iNetGlobal employees and some employees of Cash Cards, another subsidiary, who worked in a call center room that was charged with taking calls from customers in 4 languages. Keough was well aware that there were 10 persons minimum available to service the customers. Keough also went to Canada to meet with 4 of the support people there.

69.     Paragraph 51 of the Westpetal affidavit contends the "auto repurchase" feature of the computer program could not be turned off, forcing customers to re-invest their money rather than cashing out. Paragraph 60 recounts Keough's claims of his conversations on January 11 with a Nevada customer. Paragraph 61 recounts Westpetal's registration as a "free surfer" and her attempt to cancel the auto repurchase feature.

70.     There have been no significant problems with the auto repurchase feature. It is completely optional and can be turned off at any time. Customers have had other problems with cashing out, which were usually due to their not filling out the proper IRS W-9 form, and other reasons. These problems were all resolved by customer service.

71.     SA Westpetal recounts the experience of a single Nevada customer who was unable to cash out due to the auto repurchase problem.  This customer is well known to iNetGlobal.  He has consumed more customer service time than any other customer.  He is unskilled with computers and the internet.  On six separate occasion he was incapable of absorbing the instructions he was given.

72.     SA Westpetal did not understand, or chose not to tell the court, that as a "free surfer" she was not earning any money which she could cash out.  The auto repurchase feature does not even apply to a free surfer account.  Whether it is on or off for a free surfer is irrelevant.

73.     Paragraph 48 of the Westpetal affidavit says that Keough claims there were only 30,000 customers, not 50,000.  I have reviewed company records which show that as of January 5, the day Keough was fired, the company had a total of 69,551 customers.  24,259 of them were "free surfers."  45,292 of them were paying customers.  Mr. Keough lied to the Secret Service by claiming there were only 30,000 customers.

74.     Paragraph 49 of the Secret Service affidavit is incoherent.  It contends that Keough stated that at least 87% of the company's revenue was generated from the sale of memberships to members residing in China.  It then goes on to describe the revenue for the company, and in very confusing terms gives the impression that overall revenue was $28 million, 87% of which came from China, only one quarter of one percent of which was from the sale of outside income, namely the sale of 1,000 memberships at $59.95 each.  The false impression is, this was the company's only source of outside income.  I have reviewed documents and computer printouts from the company which show that this

is totally false. First, the total revenue for the company from its inception on all products is $96,231,692. This means that when Mr. Renner states at seminars that the company's revenue has been $100 million, he is substantially correct.

75.     Second, the $59.95 sales kit only generates a small amount of the company's revenue. The company has sold 50,078 consulting kits, despite Mr. Keough's contention that only 1,000 were sold. These sales brought in $2,959,454 altogether. The bulk of the company's revenues come from the sale of the advertising. Customers, old and new, pay fees on an ongoing basis for the right to post advertisements.

76.     Just one week prior to the February 23, 2010 execution of the search warrant, IMC was in the process of renting 4,000 square feet of additional space for customer service representatives and was seeking an executive to train customer service representatives. I believe that Keough was aware of these plans. In 2008, IMC hired skilled and competent attorneys from the firm of Reece & Grimes, who are familiar with marketing law, FTC rules and regulations, and the like. IMC has also employed counsel outside of the United States to ensure compliance with foreign law.

77.     75 people lost their jobs on February 23, 2010, as a result of these warrants. They were computer programmers, computer program researchers and developers, customer service workers, accountants, and sales people. Since the warrants, the company made the business decision not to take in new money from customers. It has no cash. It has survived by hiring back a skeleton crew and borrowing money to pay employees and for working capital.

78. I attach as Exhibit B, a news article dated February 25, 2010 at 1:41 a.m. by Patrick Pretty, a journalist, posted online. The article shows that as of that date and time, the journalist had in his possession a copy of the search warrant affidavit in this case. As of that time, the affidavit was still sealed, and no returns had been made to the court, according to the docket sheet. As of February 25, 2010, I had tried to get a copy of the affidavit. I was informed by the U.S. Attorney's Office it was sealed. I was not provided a copy until February 26, 2010 at 1:57 p.m., 36 hours after the press had it. Someone leaked the affidavit to the press.

79. I have learned that the Secret Service agents investigating this case are informing customers, witnesses, and employees that Steven Renner is running a Ponzi scheme. I believe it is an improper investigative technique to suggest answers to a witness. They have also told employees they cannot have a lawyer present when the Secret Service interviews them.

80. Attorney-client privileged documents were seized, both in electronic and hard copy forms. They were demanded back from the government. The government refused to return them.

81. I have made this declaration pursuant to 28 U.S.C. § 1746. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

                                    /s/ Mark J. Kallenbach
                                    Mark J. Kallenbach, Esq.